## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| XIMENA MIRANDA, | : | Case No. 1:20-cv-539 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| XAVIER UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION TO DISMISS

This putative class action is before the Court on Defendant's motion to dismiss

(Docs. 10, 13), and the parties' responsive memoranda (Docs. 15, 17).

## I.    FACTS <u>AS ALLEGED</u> BY PLAINTIFF

This case is one of many around the country between a university and its students

following the global and unprecedented upheaval of the COVID-19 pandemic.  In March

2020, American colleges and universities scrambled to meet the challenge of a highly

contagious, often deadly virus.  To protect their communities' health and comply with

emergency shelter-in-place orders, colleges shuttered dormitories, lecture halls, arenas,

libraries, and laboratories.  As campuses ground to a halt, their administrations deployed

heroic efforts to continue educating students.  Within weeks, resilient students and faculty

carried on with the business of education through web platforms like Zoom and WebEx.

The seismic shift to online learning was a modern miracle, unimagined even ten

years ago.  But for students, many of whom took on life-changing debt to buy the full

in-person experience, it was a tragedy. They felt justifiably robbed of in-person opportunities to meet friends, build professional networks, and practice practical job skills. None were affected more so than professional students seeking to enter especially hands-on fields like healthcare.

Ximena Miranda ("Plaintiff") was one of those students.[1] Like most prospective matriculants, Plaintiff reviewed Xavier's website and spoke with a Xavier admissions counselor about Xavier University's College of Nursing Accelerated Bachelor of Science in Nursing ("ABSN") program. According to them, the program would provide "a fast-paced sequence of online and on-site curriculum over four, full-time semesters."[2] Plaintiff was especially drawn to Xavier's clinical and simulation lab experiences, as well as the "guarantee" of "placement in a quality clinical environment."[3] Xavier heavily emphasized the importance of these experiences, and still does today. The ABSN website told applicants "that it is impossible to earn a BSN 100% online. As an ABSN student, you'll regularly attend hands-on skills labs at the ABSN Learning Center."[4] The website's language has not changed since 2020.

---

[1] The Court notes, with its congratulations, that Ms. Miranda has since graduated. *Xavier University, 183rd Commencement Program*, (May 8, 2021), https://www.xavier.edu/commencement/documents/2021-commencement-program.pdf.

[2] *Accelerated Bachelor of Science in Nursing Program*, Xavier University, https://acceleratednursing.xavier.edu/accelerated-nursing-program/

[3] *Id.*

[4] *Online Accelerated Nursing Coursework*, Xavier University, https://acceleratednursing.xavier.edu/accelerated-nursing-program/online-coursework/

In January 2020, Miranda ("Plaintiff") enrolled in the ABSN program. The cost of attendance was $13,500 in tuition per semester, plus an $18 per semester professional liability fee, an annual $115 student activity fee, and other fees not relevant here. The student activity fee, according to Xavier, is "charged to every full-time and part-time undergraduate or graduate student whether or not they are on campus or studying abroad." It pays for the Student Government Association and all organizations under it, including:

> over 100 on- and off-campus opportunities for students annually, over 120 clubs, and 6 subordinate bodies (including Club Sports Council, the National Pan-Hellenic Council and Resident Student Association). Other initiatives sponsored by the SGA include the free Legal Counsel for all enrolled students, a Campus Readership Program that provides free USA Today and New York Times, the Commuter Council, the Commuter Lounge in the Gallagher Student Center (GSC), and a computer kiosk for quick printing in the GSC.[5]

The professional liability fee was explained in Plaintiff's Undergraduate Nursing Student Handbook ("the Handbook") for 2019-2020. (Doc. 13-1). According to the Handbook, the professional liability fee provides nursing students professional liability insurance coverage while they participate in Xavier's clinics. *Id*. at 43.

The Handbook also outlines many other facets of the ABSN program and requires signatures indicating students' assent to its terms. *Id.* at 8. For instance, the Handbook provides a code of conduct governing students' behavior when interacting with patients.

---

[5] *See Frequently Asked Questions*, Xavier University, https://www.xavier.edu/bursar/xavierpay/xavier-payfrequently-asked-questions.

*Id.* at 17-24.  The Handbook describes the university's policies about reporting communicable diseases.  *Id.* at 26.  It sets "expectations" for students, reminding them that "[c]linical and lab attendance is **mandatory**," and that missing clinics and labs "may impact the student's ability to meet course objectives and may result in course failure." *Id.* at 32-33 (emphasis in original).  And it contains the "Policy and Procedure" for Xavier's "Clinical Simulation and Skills Labs" which tells students they "will spend time in the Nursing Skills & Simulation Labs each semester," *id.* at 35-46, requires them to submit to health screenings, *id.* at 43-44, and prescribes required uniforms, *id.* at 46.

By Plaintiff's first day of school, she had read—and, in some cases, signed—dozens of pages preparing her for an in-person learning experience.  Xavier abandoned all of it when the pandemic hit Ohio.  The entire ABSN program moved online.  Simulation labs and clinical placements were cancelled.  ABSN students did not, however, receive any refunds of tuition, student activity fees, or the professional liability fee.

On July 10, 2020, Plaintiff sued on behalf of herself and a putative class of all other ABSN students who did not receive in-person instruction.  (Doc. 1).  She brings claims for breach of contract, unjust enrichment, promissory estoppel, and, in an amended complaint, a claim under the Ohio Consumer Sales Practices Act, O.R.C. § 1345.01 *et seq.*  (Doc. 11).

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted."  To show grounds for relief, Fed. R.

Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III.     ANALYSIS

Xavier seeks to dismiss all of Plaintiff's claims.  The Court considers each in turn.

### A.     Breach of contract

Plaintiff's first claim is that Xavier breached its contract with her by cancelling all in-person instruction.  To establish a claim for breach of contract under Ohio law, a Plaintiff must show (1) the formation of a binding contract or agreement; (2) the nonbreaching party performed its obligations under the contract; (3) the defendant failed to fulfill its obligations without a legally valid excuse; and (4) the nonbreaching party suffered damages.  *Capital Equity Grp. v. Ripken Sports Inc.*, 744 F. App'x 260, 262–63 (6th Cir. 2018), citing *Carbone v. Nueva Constr. Grp., LLC*, 2017-Ohio-382, 83 N.E.3d 375, ¶ 14 (8th Dist.).  Xavier does not contest that Plaintiff performed her obligations under the contract.  Xavier attacks the sufficiency of the first, third, and fourth elements.

*First,* Xavier argues that the Handbook was its entire contract with Plaintiff and argues that Plaintiff cannot allege the formation of a binding agreement beyond the four corners of the Handbook.

Ohio law recognizes three types of contracts: express, implied in fact, and implied in law.  *Union Sav. Bank v. Lawyers Title Ins. Corp.*, 191 Ohio App.3d 540, 2010-Ohio-6396, 946 N.E.2d 835, 841 (10th Dist.).  "While both express and implied contracts require the showing of an agreement based on a meeting of the minds and mutual assent, the manner in which these requirements are proven varies depending upon the nature of the contract.'"  *Reali, Giampetro & Scott v. Soc. Nat'l. Bank*, 133 Ohio App.3d 844, 849, 729 N.E.2d 1259, 1263 (7th Dist.1999).  "In an express contract, the assent to the terms

of the contract is formally expressed in the offer and acceptance of the parties." *Id*. There is no such formal offer and acceptance in an implied contract, and no express agreement exists. *Id*. "Unlike express contracts, implied contracts are not created or evidenced by explicit agreement of the parties; rather, they are implied by law as a matter of reason and justice." *Fouty v. Ohio Dept. of Youth Servs.*, 167 Ohio App.3d 508, 2006-Ohio-2957, 855 N.E.2d 909, ¶ 56 (10th Dist.). "An implied-in-fact contract arises from the conduct of the parties or circumstances surrounding the transaction that make it clear that the parties have entered into a contractual relationship despite the absence of any formal agreement." *Id*.

In Ohio, the relationship between a university and its students is "contractual in nature." *Al–Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015) (quoting *Behrend v. State*, 55 Ohio App.2d 135, 139, 379 N.E.2d 617 (10th Dist. 1977)); *Thomas v. Gee*, 850 F. Supp. 665, 674 (S.D. Ohio 1994). The "terms of such contract are found in the college catalog and handbook supplied to students." *Buescher v. Baldwin Wallace Univ.*, 86 F. Supp. 3d 789, 797-98 (N.D. Ohio 2015), quoting *Jefferson v. Univ. of Toledo*, 10th Dist. Franklin No. 12AP-236, 2012-Ohio-4793, ¶ 15.

Generally, "an express agreement," such as a student handbook, "and an implied contract, such as one which would be raised under a quasi-contract/unjust enrichment theory, cannot exist in connection with the same thing at the same time." *Lone Star Equities, Inc. v. Dimitrouleas*, 2015-Ohio-2294, 34 N.E.3d 936, ¶ 71 (2d Dist.). But this rule does not apply where the express contract is invalid, ineffective, or otherwise does not cover the issue in dispute. *See Shaffer v. George Washington Univ.*, 27 F.4th 754

(D.C. Cir. 2022); *see also Cristino v. Bur. of Workers' Comp.*, 2012-Ohio-4420, ¶ 24, 977 N.E.2d 742, 753 (finding that an implied contract may govern behavior not contemplated in an existing express contract). Thus, university publications besides a student handbook may become a part of the contract between a university and its students. *See Zahn v. Ohio Univ.*, Ct. of Cl. No. 2020-00371JD, 2020 WL 6163919, at *3 (Oct. 19, 2020); *Shaffer*, 27 F.4th 754, 2021 WL 678086 at *6 (examining universities' online representations to find that Plaintiff had stated a claim for breach of an implied contract); *see also Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D. Conn. 2000) ("Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises … appears sound."); *Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 317 (D. Mass. 1997) ("[A]dvertisements can form the basis of contractual agreements" between students and universities).[6]

Even where there is a valid comprehensive express contract, however, the Federal Rules expressly authorize a party to plead alternative and even inconsistent claims, such

---

[6] Xavier cites one federal district court case from the Western District of North Carolina for the proposition that a Plaintiff may not state a breach of contract claim based on representations a university makes on its website. (Doc. 13 at 8 citing *Krebs v. Charlotte Sch. of Law, LLC*, No. 3:17-CV-00190-GCM, 2017 WL 3880667, at *5 (W.D.N.C. Sept. 5, 2017)). Xavier has overstated the language of that case. The district court concluded only that the specific language on that university's website could not support a claim for breach of contract; *not* that no university could ever be bound to statements they make on websites or marketing materials.

as contractual and quasi-contractual claims for relief. *See* Fed.R.Civ.P. 8(d)(3) ("[a] party may state as many separate claims or defenses as it has, regardless of consistency").

Here, the parties agree that their relationship was contractual and that the Handbook functioned as a written contract. Where they disagree is on the *scope* of the Handbook's written contract. Defendant argues from the perspective that the Handbook governs the entire relationship between Xavier and its ABSN students. Plaintiff prefers that the Handbook reaches only some of the parties' rights and obligations. She would have the Court look at Xavier's website and marketing materials to understand the full scope of promises Xavier made (and allegedly broke).

Accepting Plaintiff's factual allegations as true, Plaintiff has plausibly alleged that the scope of her agreement with Xavier was broader than the four corners of the Handbook. The Court agrees that a claim for breach of contract may lie based on representations Xavier made outside of the Handbook. Those representations plausibly formed an implied-in-fact contract that may have supplemented the rights and obligations in the Handbook's express contract. In this case, Xavier's representations are especially specific. Its website claimed to "*guarantee* … placement in a quality clinical environment," and told prospective students, "[I]t is *impossible* to earn a BSN 100% online." (Doc. 1 ¶¶ 24, 34, emphasis supplied). Drawing all reasonable inferences in Plaintiff's favor, these statements are promises to provide clinical placements and "hands-on skills labs" that Plaintiff was entitled to rely on when she paid her tuition. *See Shaffer*, 27 F.4th 754, 2021 WL 678086 at *5.

*Second,* Xavier argues that it performed on the contract, whether express or implied, and that the Court should not second guess its performance. Xavier asserts that it provided the "same substantive education and instruction, even though the mode of delivery was different," (Doc. 13 at 9) and that it expressly reserved the right to restructure the program in response to the changing circumstances, *id.* at 10.

Whether Plaintiff received adequate training to become a nurse *is* a question beyond the Court's consideration. *See Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988) ("The federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum."). But the Court need not consider the quality of Plaintiff's education to permit her claim that Xavier promised Plaintiff a specific experience that it failed to provide. Whether or not that experience was necessary to becoming a nurse is irrelevant.

Here, these alleged promises appear in both the Handbook and on Xavier's website. As stated above, Xavier's website "[g]uarantee[d] a placement in a quality clinical environment" and called it "impossible to earn a BSN 100% online." (Doc. 11 at ¶¶ 45, 57). The Handbook made similar statements. It impressed upon students that "[c]linical and lab attendance [was] mandatory" (Doc. 13-1 at 33) and required them to make extensive preparations for these in-person experiences such as reading and signing HIPAA acknowledgements (*id.* at 24-25, 30-31), certifying their fitness for clinical practice (*id.* at 33), undergoing immunizations and health screenings (*id.* at 43-44), and purchasing policy-compliant uniforms (*id.* at 45-46). "A reasonable person would have assumed the university intended to bind [itself] to providing in-person education in

10

exchange for retaining Plaintiffs' entire tuition payments." *See Shaffer v. George Washington Univ.*, 27 F.4th 754, 2022 WL 678086, at *5 (D.C. Cir. 2022). Indeed, the Handbook expressly instructed students to purchase scrubs and pay for immunizations and physical exams in reliance on Xavier's promise to provide clinical and lab experiences.

Despite all this, Xavier responds that it made no such promise to offer in-person clinical and lab experiences because the Handbook expressly gave Xavier the right to change the curriculum. Xavier points to a footnote on a page of the handbook titled "Undergraduate Program Curricular Policies" that says, in its entirety:

> Faculty reserves the right to change the curriculum if deemed necessary for the progressive development of the program. For further information on grading policies, consult the University catalog.

(Doc. 13-1 at 60). According to Xavier, this footnote bestows absolute power to delete lab and clinical work from the ABSN curriculum. That is a gossamer thin reed on which to dismiss Plaintiff's entire breach of contract claim. The Handbook does not explain what is meant by "progressive development of the program." It does not specifically address emergencies like a global disease outbreak "or other *force majeure* events. In particular, it says nothing about allocating the financial risk of those events to the students, as [Xavier] contend[s]." *Shaffer*, 2022 WL 678086, at *6. Nothing in the footnote, nor any other part of the Handbook, suggests that Xavier intended to retain "unfettered rights to shut down on-campus educational activities and use online learning

11

in its place after students have paid tuition for traditional on-campus courses." *Id.*[7]  The

footnote is, at best, ambiguous.  Generally, interpretation of contracts—especially

ambiguous ones—is a question of fact inappropriate for resolution on a motion to

dismiss.  *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409,

422 (6th Cir. 2008) ("If a contract contains ambiguities, it generally becomes the task of

the fact-finder to use extrinsic evidence to determine the intent of the parties.");

*Heidtman Steel Prod., Inc. v. Faurecia Auto. Seating, Inc.*, 919 F. Supp. 2d 928, 931

(N.D. Ohio 2013); *DeNune v. Consol. Capital of N. Am., Inc.*, No. 3:02CV7241, 2004

WL 1474653, at *2 (N.D. Ohio May 21, 2004) ("Contract interpretation is inappropriate

for a motion to dismiss."); *In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, No. 2:03-

MD-1565, 2006 WL 2849784, at *7 (S.D. Ohio Oct. 3, 2006) ("The Court, though, will

not resolve a conflict in contract interpretation on a motion to dismiss."); *Exact Software

N. Am., Inc. v. Infocon Sys., Inc.*, No. 3:03CV7183, 2004 WL 952876, at *5 (N.D. Ohio

Apr. 16, 2004) (same).  Thus, the Court cannot, as a matter of law, conclude that the

footnote precludes any claim for breach of contract based on Xavier's cancellation of all

in-person education for the ABSN program.  The parties will have an opportunity to

develop evidence supporting the correct interpretation of the footnote later in this

litigation.

---

[7] Even with more evidence, the Court would resist an interpretation that gives Xavier broad
authority to nullify vast swaths of the Handbook.  *M & G Polymers USA, LLC v. Tackett*, 574
U.S. 427, 440 (2015) (The "illusory promises doctrine … instructs courts to avoid constructions
of contracts that would render promises illusory because such promises cannot serve as
consideration for a contract.").

Taking stock up to this point, Plaintiff has plausibly alleged that Xavier promised to provide in-person learning in both the student Handbook and its website, that Xavier failed to deliver on those promises, and that no provision in any contract unambiguously reserves that right for Xavier.

*Third,* Xavier argues that Plaintiff cannot establish damages because she still received a nursing education and, indeed, has a nursing degree. Once again, Xavier asserts that it is not for the Court to determine what constitutes an adequate nursing education. But that point remains irrelevant. Xavier itself deems in-person learning so indispensable that it makes attendance strictly mandatory (Doc. 13-1 at 33) and, to this day, considers it "impossible to earn a BSN" without clinical or lab experience.[8] These experiences were clearly valuable, regardless of whether they were *necessary* to become a nurse. Plaintiff need not allege the precise value of her damages to state a claim for breach. It is enough that Plaintiff has plausibly alleged that she sought out—and paid valuable consideration for—a specific experience that Xavier promised but did not provide. *See Shaffer*, 2022 WL 678086 at *6.

*Fourth*, Xavier argues that, if there was a breach, Plaintiff ratified it by continuing to attend Xavier's ABSN program in subsequent semesters. In Ohio, ratification is defined "as the approval by act, word, or conduct of that which was improperly done"— in this case, a breach of Xavier's contract with its ABSN students. *AFCO Credit Corp. v.*

---

[8] *Online Accelerated Nursing Coursework*, Xavier University, https://acceleratednursing.xavier.edu/accelerated-nursing-program/online-coursework/ (last visited March 28, 2022)

*Brandywine Ski Ctr., Inc.*, 81 Ohio App. 3d 217, 221, 610 N.E.2d 1032, 1035 (1992). "The intention to ratify is an essential element, and is at the foundation of the doctrine of ratification." *Id.* Xavier cites to no facts from the complaint about Plaintiff's intentions when she reenrolled. In summer 2020, when Plaintiff decided to return for another semester, she may well have believed the pandemic was waning, and that in-person learning was poised to return. Indeed, the complaint alleges that Xavier never changed the representations on its website or in the Handbook. Thus, *resolving all factual issues in Plaintiff's favor*, Xavier continued to promise clinical and lab experiences that it did not provide. At this early stage, the Court cannot conclude that Plaintiff ratified Xavier's conduct.

Accordingly, the Court concludes that Plaintiff has stated her claim for breach of both the Handbook and an implied contract. The Court is careful to note, however, that this litigation is still early. Discovery is needed to understand the precise contours of the Handbook's promises, whether any separate implied contract existed, and, if either was breached, whether defendant has any viable defenses to breach. In particular, Xavier may raise arguments that "the legality of providing in-person instruction was a basic assumption on which the contracts were made," and "that the pandemic and resulting government-issued shutdown orders discharged [its] duties to perform." *Shaffer v. George Washington Univ.*, 27 F.4th 754, 2022 WL 678086 at *6 (D.C. Cir. 2022) citing Restatement (Second) of Contracts § 261 ("Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his

duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."); *id*. § 264 ("If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."). Xavier has not yet raised that defense, however, so the Court will not address it.

Based on the forgoing, the Court concludes that Plaintiff has stated a claim for breach of contract based on her payment of tuition. The Court likewise concludes that she has stated a claim for breach based upon her payment of the professional liability insurance fee. The Handbook expressly required Plaintiff to pay for "university liability insurance coverage of $18 per semester when enrolled in practicum courses." (Doc. 13-1 at 51). Xavier relies heavily on the Handbook's statement that this fee, and a list of several others, was "non-refundable." But merely calling the fee non-refundable does not render Plaintiff's claim for breach implausible. According to Plaintiff's interpretation, the fee was only to be paid "when [she was] enrolled in practicum courses." Indeed, several of the fees that are supposedly "non-refundable" Xavier apparently did not retain, such as "lab fees" and "simulation expenses." Thus, the Handbook's section on "non-refundable" fees is not so unambiguous that the Court can extinguish Plaintiff's claim for breach on a motion to dismiss. *Nashville Underground, LLC v. AMCO Ins. Co.*, 523 F. Supp 3d. 1006, 2021 WL 826754 (M.D. Tenn. Mar. 4, 2021).

Plaintiff's claim for breach of contract based on the payment of student activities fees presents a different question, however. Plaintiff represents that the student activity

fee "no longer provide[s] a cognizable benefit to ABSN students" because "there are currently no student activities."  (Doc. 11 at ¶¶ 8, 36, 63).  Unlike her tuition and professional liability fee, which Plaintiff *has* sufficiently alleged were paid in consideration for in-person learning, nothing about the student activities fee obligated Xavier to provide in-person or on-campus "activities."  Xavier points to its website which states the fee is "charged to every full-time and part-time undergraduate or graduate student whether or not they are on campus or studying abroad," and pays for the Student Government Association and all organizations under it, including:

> over 100 on- and off-campus opportunities for students annually, over 120 clubs, and 6 subordinate bodies (including Club Sports Council, the National Pan-Hellenic Council and Resident Student Association). Other initiatives sponsored by the SGA include the free Legal Counsel for all enrolled students, a Campus Readership Program that provides free USA Today and New York Times, the Commuter Council, the Commuter Lounge in the Gallagher Student Center (GSC), and a computer kiosk for quick printing in the GSC.[9]

Many of these activities are just as easy to access remotely.  Some, such as "free Legal Counsel," subscriptions to news outlets, and affinity groups and clubs operating online, may even have been *more* valuable while stay-at-home orders were in effect.  Plaintiff has not alleged that Xavier stopped funding these resources in March 2020.  Accordingly, Plaintiff fails to plausibly allege that Xavier breached a duty to provide student activities in exchange for the fee.  *See Shaffer*, 2022 WL 678086 at *8.

---

[9] *See Frequently Asked Questions*, Xavier University, https://www.xavier.edu/bursar/xavierpay/xavier-payfrequently-asked-questions.

Accordingly, Plaintiff has stated a claim for breach of contract as to her tuition and professional liability insurance payments. Xavier's motion to dismiss those claims is **DENIED.** Plaintiff has not, however, stated a claim for breach of contract related to her student activity fees. Xavier's motion with respect to that claim is **GRANTED**, and that claim is therefore **DISMISSED.**

### B. Unjust Enrichment

Xavier next argues for dismissal of Plaintiff's unjust enrichment claims. In Ohio, a plaintiff must establish the following three elements to prove unjust enrichment: "(1) a benefit conferred by the plaintiff upon the defendant, (2) knowledge by the defendant of the benefit, and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Nat'l/RS, Inc. v. Huff*, 2010-Ohio-6530, ¶ 28. Plaintiff claims that Xavier has unjustly retained a portion of her tuition without providing the benefit of in-person instruction. Xavier attacks this claim on two fronts.

*First,* Xavier asserts that Plaintiff cannot bring an unjust enrichment claim where she has also alleged the existence of an express contract. Xavier relies on this Court's decision in *Borden v. Antonelli Coll.*, 304 F. Supp. 3d 678 (S.D. Ohio 2018). In that case, the Court held that under Ohio law, a claim for unjust enrichment could not be brought "*where the subject matter of the claim* is governed by a contract between the parties." *Id.* at 692 (emphasis supplied); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 2(2) ("A valid contract defines the obligations of the parties as to matters *within its scope*, displacing to that extent any inquiry into unjust enrichment." (emphasis supplied)). In this case, the parties *dispute* whether the subject matter of Plaintiff's claim

17

is governed by an express contract between the parties. The scope of Xavier's contract with its ABSN students is at the heart of Xavier's arguments to dismiss the breach of contract claim. Xavier asserts that the Handbook represents the full scope of the parties' agreement. Plaintiff asserts that the contract encompasses statements made on Xavier's website promising in-person learning. The parties vigorously dispute the effectiveness of the footnote that Xavier claims confers an absolute right to suspend in-person learning. Furthermore, major questions still remain about the enforceability of *any* contract given the possibility that government shutdown orders or other features of the global pandemic discharged Xavier's duty to perform. Until those issues are resolved, Plaintiff is free to argue her claims in the alternative. Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain ... a demand for the relief sought, which may include relief in the alternative or different types of relief."); *id*. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

*Second,* Xavier argues that Plaintiff's claim for unjust enrichment should fail because she cannot show that it would be unfair for Xavier to retain the tuition and fees. Xavier argues that it is entitled to the tuition because, "in the face of a global pandemic and national disaster, the school continued to provide a quality education and the ability to earn uninterrupted credits towards her degree." (Doc. 13 at 29). Xavier's efforts were doubtless herculean, but the school did not supply its ABSN students in-person clinical or lab experiences. Yet even today Xavier represents that these experiences are an indispensable part of the ABSN program. Plaintiff's allegation is that Xavier saved money by forgoing them. Determining whether Xavier realized a net savings "is a fact-

18

intensive question inappropriate for resolution at the motion-to-dismiss stage." *Shaffer v. George Washington Univ.*, 27 F.4th 754, 2022 WL 678086, at *10 (D.C. Cir. 2022); *see also See Ninivaggi*, ⸺ F.Supp.3d at ⸺, 2021 WL 3709765, at *6 ("If the school saved money by substituting online for in-person classes, it might have to give those savings back to the students.").

Thus, Plaintiff has stated a claim for unjust enrichment. Xavier's motion to dismiss the claim for unjust enrichment is **DENIED.**

### C.     Promissory estoppel

Xavier next seeks to dismiss Plaintiff's claim for promissory estoppel. Under Ohio law, Plaintiff is required to plead "(1) a promise; (2) that the promisor should reasonably expect to induce action or inaction on the part of another; (3) which does induce the action or inaction; and (4) injustice will result if the promise is not enforced." *Paar v. Jackson Twp. Bd. of Trs.*, 5th Dist. Stark No. 2003-CA-00334, 2004-Ohio-5567, ¶ 16. Xavier argues that Ohio law bars a promissory estoppel claim when there is an express contract between the parties. *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 895 (N.D. Ohio 2017). This argument suffers from the same defect as Xavier's basis for dismissing the unjust enrichment claim. Whether the express agreement governs the issue in dispute remains unresolved. The express contract does not specify what should happen if a global catastrophe forces Xavier to cancel in-person learning. Thus, the Court cannot say, at this stage, whether an express agreement covers the same subject matter as Plaintiff's promissory estoppel claim. Plaintiff is therefore free to state her claims in the alternative. Fed R. Civ. P. 8(a)(3), (d)(3).

19

Xavier further argues that promissory estoppel may not lie where reliance on an alleged promise was not "reasonable." *See, e.g., Doe v. Adkins*, 674 N.E.2d 731, 737 (Ohio Ct. App. 1996). And here, Plaintiff's reliance was not reasonable because the Handbook contained a footnote that reserved Xavier's right to modify the curriculum for the "progressive development of the program." This argument is untenable. Reading the Handbook as Xavier suggests would render its contents illusory. Plaintiff sufficiently alleged that her reliance on the promise of in-person instruction was not only reasonable, it was demanded of her. The complaint reproduces dozens of statements from both online resources and the Handbook illustrating that in-person labs and clinics were not only beneficial but *mandatory*. (Doc. 11 at ¶¶ 45, 48, 50-58). For example, the complaint states that in-person practicum attendance and evaluations constituted up to 50% of her grade in some classes. Plaintiff has therefore sufficiently stated that her reliance on these representations was reasonable.

Xavier's motion to dismiss Plaintiff's claim for promissory estoppel is **DENIED.**

### D. Ohio Consumer Sales Practices Act

Plaintiff's final claim is that Xavier violated the Ohio Consumer Sales Practice Act ("OCSPA"), O.R.C. § 1345.01, *et seq.*, by failing to provide in-person clinical or lab instruction despite representing that it would. To state a claim under OCSPA, (1) Plaintiff and the class must be a consumer within the meaning of O.R.C. § 1345.01(D); (2) Defendant must be a supplier (*id.* at § 1345.01(C)); (3) Plaintiff must allege an unfair or deceptive act under § 1345.02 or an unconscionable act under § 1345.03; in connection with (4) a consumer transaction, which under § 1345.01(A), is a

"a sale … of … a service … to an individual for purposes that are primarily personal, family, or household … ."  A plaintiff may assert an OCSPA claim on behalf of a putative class only where:

> the violation was an act or practice declared to be deceptive or unconscionable by rule adopted [by the Ohio Attorney General] before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code....

O.R.C. § 1345.09(B); *Savett v. Whirlpool Corp.*, No. 12 CV 310, 2012 WL 3780451, at *3 (N.D. Ohio Aug. 31, 2012).  Xavier challenges the sufficiency of this claim on two grounds.

*First,* Xavier asserts that enrollment in nursing school in not a consumer transaction for purposes of the act because it is not "for purposes that are primarily personal, family, or household."  Xavier cites *MacDonald v. Thomas M. Cooley Law Sch.*, which held that law school students who purchased their legal education from a private school did so for business purposes and therefore did not engage in a consumer transaction. 724 F.3d 654, 660 (6th Cir. 2013).  But this case interpreted the *Michigan* Consumer Protection Act.  *Id.*  Federal courts sitting in diversity jurisdiction are obligated to apply state substantive law.  *Hanna v. Plumer*, 380 U.S. 460, 471 (1965).  Thus, regardless of the similarities in wording between the Michigan law and the Ohio law, this Court is bound to follow Ohio courts' interpretations of Ohio law.

Ohio courts frequently permit OCSPA claims to lie between a student and her university. *See, e.g.*, *Malone v. Acad. of Court Reporting*, 64 Ohio App.3d 588, 594, 582 N.E.2d 54 (10th Dist. 1990) ("Defendants' contention that the Consumer Sales Practices Act is not applicable because the legislature never intended it to apply to regulated professional schools is not well taken."); *Schneider v. Acad. of Court Reporting*, 10th Dist. Franklin No. 93APE07-989, 1994 WL 109718, at *6-7 (Mar. 31, 1994) (same); *Hacker v. Nat'l. Coll. of Bus. & Tech.*, 186 Ohio App.3d 203, 2010-Ohio-380, 927 N.E.2d 38, ¶ 20 ("the trial court concluded, and the parties do not dispute, that National College is subject to the CSPA."); *Krueck v. Youngstown State Univ.*, 9th Dist. No. 18CA011391, 2019-Ohio-3219, 131 N.E.3d 1030, ¶ 16 ("we disagree with the trial court's conclusion that the CSPA was inapplicable."); *Ajibola v. Ohio Med. Career Coll., Ltd.*, 2nd Dist. No. 27975, 2018-Ohio-4449, 122 N.E.3d 660, ¶ 37 ("It is undisputed for purposes of this appeal that the College is a 'supplier,' that Madison and Hubbard are 'consumers,' and that their contract for educational services was a 'consumer transaction' within the meaning of [OCSPA]."). Accordingly, the Court cannot dismiss Plaintiff's OCSPA claim simply because Defendant is a university.

*Second*, Xavier argues that it did not have notice that its conduct might violate OCSPA as required to state a claim on behalf of a class. O.R.C. § 1345.09(B). A consumer may "qualify for class-action certification under [OCSPA] only if the defendant's alleged violation ... is substantially similar to an act or practice previously declared to be deceptive." *Marrone v. Philip Morris USA, Inc.*, 110 Ohio St.3d 5, 850 N.E.2d 31, 33 (2006) (emphasis added)). "Substantial similarity means a similarity not in

every detail, but in essential circumstances or conditions." *Id*. at 10. "Cases that involve industries and conduct very different from the defendant's do not provide meaningful notice of specific acts or practices that violate the CSPA." *Id*. at 9.

Plaintiff's amended complaint offers 13 cases by Ohio courts and four provisions of the Ohio Administrative Code that it asserts provided Xavier with notice.

The Court addresses the cases by Ohio courts first. A plaintiff may demonstrate notice where an Ohio court has "determined" that the specific practice violates the OCSPA. *Amato v. Gen. Motors Corp.*, 463 N.E.2d 625, 632 (Ohio 1982); *Pattie v. Coach, Inc.*, 29 F. Supp. 3d 1051, 1055 (N.D. Ohio 2014); *Volbers-Klarich v. Middletown Mgt., Inc.*, 929 N.E.2d 434, 441 (Ohio 2010). Federal courts applying OCSPA have consistently held that, to provide notice, the prior decision has to be a "final determination" on facts that are substantially similar to the allegations at issue. *Pattie v. Coach, Inc.*, 29 F. Supp. 3d 1051, 1057 (N.D. Ohio 2014) ("[I]t is clear that the reference to a court's 'determination' in § 1345.09(B) is a reference to a court's final determination, *i.e.,* a judgment with supporting reasoning."); *Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 680 (6th Cir. 2017) (same); *Gascho v. Glob. Fitness Holdings, LLC*, 918 F. Supp. 2d 708, 715 (S.D. Ohio 2013) (same); *Savett v. Whirlpool Corp.*, No. 12 CV 310, 2012 WL 3780451, at *4 (N.D. Ohio Aug. 31, 2012) (order on motion to dismiss did not provide notice). This makes sense. Only a final determination acts as a reliable pronouncement of law on which consumers and suppliers can predictably structure their behavior.

Plaintiff cited four cases involving disputes between educational institutions and students. Each of them were dismissed before trial; the cited decisions are *not* final determinations. *See Krueck v. Youngstown State Univ.*, 2019-Ohio-3219, 131 N.E.3d 1030 (decision on a motion to dismiss); *Ajibola v. Ohio Med. Career Coll., Ltd.*, 2018-Ohio-4449, 122 N.E.3d 660 (same); *Hacker v. Natl. Coll. of Bus. & Tech.*, 2010-Ohio-380, 186 Ohio App. 3d 203, 927 N.E.2d 38 (order denying summary judgment in part but recognizing a genuine issue of fact on one claim); *Malone v. Acad. of Ct. Reporting*, 64 Ohio App. 3d 588, 582 N.E.2d 54 (1990) (motion to dismiss). Accordingly, because these decisions did not find the defendant schools liable, they cannot serve as prior notice that Xavier's conduct was a violation of OCSPA.

Almost all the remaining decisions Plaintiff cites in her amended complaint *are* final decisions, but none are related to higher education. Having painstakingly reviewed each of them, the Court cannot discern how any would have provided Xavier notice that its conduct violated OCSPA.[10] By citing these cases, Plaintiff asks the Court to engage in

---

[10] *State ex rel. Fisher v. Warren Star Theatre*, 616 N.E.2d 1192 (Ohio Ct. App. 1992) (violation for tickets sold after a show had been cancelled); *Daniels v. True*, 547 N.E.2d 425 (Ohio Mun. Ct. 1988) (violation where supplier continually stalled and evading legal obligations with "no valid legal defenses for not performing"); *Layne v. McGowen*, No. 14676, 1995 WL 316233 (Ohio Ct. App. May 24, 1995) (reversing directed verdict that found defendant liable for failing to honor a warranty); *Brown v. Spears*, No. 8897, 1979 WL 52451 (Ohio Mun. Ct. Aug. 20, 1979) (furnace supplier's violation of Magnuson Moss Warranty and intentional breach of contract also violated OCSPA); *Teeters Constr. v. Dort*, 869 N.E.2d 765 (Ohio Mun. Ct. 2006) (violation for misrepresenting length of window warranty); *State ex rel. Fisher v. Renters' Assistance Foundation, Inc.*, No.92AP-1590, 1993 WL 360277 (Ohio Ct. App. Sept. 14, 1993) (violation for pattern of dilatory behavior); *State ex rel. Celebrezze v. Ferraro*, 578 N.E.2d 492 (Ohio Ct. App. 1989) (violation for illusory warranty); *State ex rel. Celebrezze v. Venture Out Resorts, Inc.*, No. 43-14146, 1988 WL 877630 (Ohio C.P. Feb. 24, 1998) (series of violations for manipulative membership practices at a "camping resort"); *State ex rel. Celebrezze v. Chimento*,

24

an abstract thought exercise, drawing analogies between furnace suppliers or camp resort operators back to a university providing nursing education during an unprecedented pandemic. These cases fall well short of the "substantial similarity" called for in *Marrone*, 850 N.E.2d at 33.

Finally, Plaintiff asserts that four Ohio Administrative Code citations should have provided Xavier notice: §§ 109:4-3-10(A), 4-3-02(A)(1), 4-3-02(D), 4-3-09(A)(2). A "generic prohibitions that does not refer to any specific act or practice" is insufficient to put a defendant on notice that they violated OCSPA. *Marrone*, 850 N.E.2d at 37. Ohio Administrative Code §§ 109:4-3-10 and 4-3-02 have been rejected for just this reason. *Id.* (rejecting Ohio Admin. Code § 109:4-3-10 as a basis for notice); *Nicols v. R.J. Reynolds Tobacco Co.*, No. CV 99-11-4539 (Ohio C.P. Aug. 9, 2000) (rejecting Ohio Admin. Code § 109:4-3-02 and § 109:4-3-10). The viability of Plaintiff's OCSPA claim thus rests on whether Ohio Administrative Code § 109:4-3-09 suffices for notice.

Ohio Administrative Code § 109:4-3-09(A)(2) provides:

> (A) It shall be a deceptive act or practice in connection with a consumer transaction for a supplier:
>
> (2) To accept money from a consumer for goods or services ordered by mail, telephone, the internet, or otherwise and then permit eight weeks to elapse without:
>
> (a) Making shipment or delivery of the goods or services ordered;
>
> (b) Making a full refund;

---

80 CV 1520, 1984 WL 264715 (Ohio C.P. Sept. 21, 1984) (violation for waiver of rights in tour contract).

> (c) Advising the consumer of the duration of an extended delay and offering to send the consumer a refund within two weeks if the consumer so requests; or
>
> (d) Furnishing similar goods or services of equal or greater value as a good faith substitute if the consumer agrees.

The Court cannot conclude that this broad language "that does not refer to any specific act or practice" could have given Xavier notice. Applying for admission and paying tuition is not substantially similar to "services ordered by mail, telephone, the internet, or otherwise." And even if it could be contorted to fit that box, a nursing education is not a service that can be "deliver[ed]" in eight weeks even in the best pandemic-free circumstances.

Plaintiff has failed to allege that Xavier had notice, and, therefore, cannot state a class claim under OCSPA. *Bower v. Int'l Bus. Machines, Inc.*, 495 F. Supp. 2d 837, 841 (S.D. Ohio 2007). Xavier's motion to dismiss is this claim is **GRANTED.** Count IV is dismissed.

### E.    Educational malpractice

Xavier's final argument is not addressed to any claim. Rather Xavier accuses Plaintiff of trying to smuggle a non-cognizable education malpractice claim into her other claims. The Court sees no reason to recast Plaintiff's claims as educational malpractice claims, and no reason to engage further with this argument. A plaintiff is the master of her complaint and can choose which claims to bring. *Father Flanagan's Boys Home v. Donlon*, 449 F. Supp. 3d 739, 748 (S.D. Ohio 2020). Plaintiff's claims are cognizable on

their own merits.  Adjudicating them does not require the Court to subjectively value the quality of Plaintiff's education, as an educational malpractice claim would.

## IV.    CONCLUSION

Based upon the foregoing, the Motion to Dismiss (Docs. 10, 13) is **GRANTED IN PART** and **DENIED IN PART.**  Plaintiff's claim for breach of contract based on her payment of student activity fees is **DISMISSED**.  Likewise, Plaintiff's claim under the Ohio Consumer Sales Price Ace is **DISMISSED**.

Accordingly, the following claims remain:

1.    Breach of contract as to tuition and professional liability insurance (Count I);

2.    Unjust enrichment (Count II); and

3.    Promissory estoppel (Count III).

**IT IS SO ORDERED.**

Date:  3/28/2022                                                        *s/Timothy S. Black*
                                                                          Timothy S. Black
                                                                          United States District Judge